**FRONTIER COMPANIES OF ALASKA, INC., Appellant,**

v.

**JACK WHITE COMPANY, Appellee.**

**ARCTIC SLOPE REGIONAL CORPORATION, Appellant,**

v.

**JACK WHITE COMPANY, Appellee.**

No. S–3800, S–3801.

Supreme Court of Alaska.

Oct. 4, 1991.

646

Patrick H. Owen, Galbraith & Owen, P.C., Anchorage, for appellant Frontier Companies of Alaska.

Allan J. Olson, Staley, DeLisio, Cook & Sherry, Inc., for appellant Arctic Slope Regional Corp.

Duncan A. Stuart, William M. Bankston, Bankston & McCollum, P.C., Anchorage, for appellee Jack White Co.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

### INTRODUCTION

At issue is the effect to be given a real estate broker's exclusive listing agreement when the sale was not formally completed until after the agreement had expired. We have been asked to review the denial of directed verdicts regarding when the sale occurred, whether the seller acted in bad faith, and whether the buyer induced a breach of the listing agreement. The buyer and seller also claim error in the trial proceedings. Specifically, we must determine whether a settlement agreement was improperly discussed before the jury, and whether the trial court erred by answering a question from the jury without consulting counsel. Finally, the propriety of the award of attorney's fees and costs must be assessed.

### FACTUAL AND PROCEDURAL BACKGROUND

Frontier Company of Alaska ("Frontier") and Jack White Company ("Jack White") entered into an exclusive listing agreement for the sale of Frontier's "Arctic Spur" commercial property.[1] The agreement provides in part:

> This agency shall continue irrevocably for the full period beginning August 11, 1986, to midnight August 11, 1987. Owner agrees to pay Agent ... six % of the selling price as compensation if the property is sold or transferred by anyone, including Owner, during the contract period or if sold or transferred within 180 days after expiration of that period to anyone who negotiated during the period of this agreement with Agent....
>
> \* \* \* \* \* \*
>
> Agent agrees to use diligence in procuring a purchaser and to SUBMIT THIS LISTING TO THE MULTIPLE LISTING SERVICE WITHIN SEVENTY-TWO HOURS.

(Emphasis in original.) The initial listing price was $2,995,000.00.[2]

Arctic Slope Regional Corporation ("ASRC") was interested in acquiring property in Anchorage for an office and met with broker John Morrison of the Brayton Company in December 1986 to discuss several properties. Morrison suggested the Frontier property to ASRC. ASRC indicated it was aware of the property but that it was too expensive. Although Morrison maintained contact with ASRC, it appears that the Frontier property was not again discussed.

In early 1987, Frontier independently initiated discussions with ASRC relating to the possible sale of the Arctic Spur proper-

---

1. This was an "exclusive sale" contract as opposed to an "exclusive agency" contract. As such, Jack White was entitled to a commission if the property sold within the specified time regardless of whether the broker played a role in locating the purchaser.

2. The listing price was reduced by Frontier to $2.5 million on December 10, 1986. The listing price was not further reduced.

ty. Frontier was in the process of selling a number of its business operations and assets to ASRC. Frontier repeatedly tried to interest ASRC in the property, but ASRC remained indifferent. On August 4, 1987, Frontier's Robert Helsell contacted ASRC's Conrad Bagne and told him that Frontier was "getting to the point where we were going to make somebody a very good deal on that building." Bagne responded that Frontier should approach ASRC next winter since ASRC was still not interested in buying the building.

Frontier and ASRC again discussed the Arctic Spur property in an August 5, 1987 meeting which had been scheduled to discuss a number of items of unfinished business between the two companies. Helsell said that Frontier was willing to reduce the price of the building from $2.5 million to $1.8 million if ASRC would make certain concessions, including permitting Frontier to remain in a portion of the building rent-free for a period of time. Bagne responded that he would recommend that ASRC purchase the property for $1.7 million. The price appears to have been settled on August 5, but Frontier and ASRC contend that a deal was not struck until later, specifically after the listing agreement had expired. The parties were aware that the listing agreement would soon expire, and chose to wait until after August 11 to complete the transaction.

ASRC and Frontier met again on August 18, 1987 to finalize the sale of the building. Some changes were made to the draft agreement which had been prepared for this meeting, including the addition of a clause requiring approval by the ASRC board of directors. The agreement was signed on August 18 subject to ASRC board approval which was obtained on August 19. The sale closed on October 9, 1987.

Jack White filed suit against Frontier claiming that it was entitled to a six percent commission. In Count I, it alleged that ASRC's contacts with Morrison were negotiations entitling Jack White to the commission. In Count II, it asserted that Frontier had breached its implied obligation

of good faith and fair dealing by postponing the sale until the listing agreement had expired. Frontier brought a third-party claim against ASRC because Jack White had alleged ASRC had negotiated with a broker (Morrison), which conflicted with ASRC's representation to Frontier that no brokers were involved in the transaction. Frontier and ASRC settled the claim out of court agreeing to share any liability to Jack White. Jack White amended its complaint to add ASRC as a defendant claiming that ASRC was liable for intentional interference with contractual relations between Frontier and Jack White. The amended complaint also plead an additional theory against Frontier, namely that the sale had taken place within the listing period.

The case was tried to a jury. At the conclusion of the evidence Frontier and ASRC moved for a directed verdict against Jack White. Frontier alleged that there was no evidence from which the jury could conclude that the property was sold while the listing agreement was in effect, or that it had acted unfairly or in bad faith. ASRC reiterated that there was not a breach of the listing agreement, but added that even if a breach was found, there was no evidence from which the jury could conclude that ASRC had induced the breach. The motions were denied and the case submitted to the jury.

During deliberations the jury sent a question through the bailiff to the trial judge. The judge returned an answer to the jury without notifying counsel.

By a 10–2 vote the jury found against Jack White on the negotiation claim, and for Jack White on the claims that Frontier breached the contract, both by selling the property within the contract period and by violating the implied covenant of good faith and fair dealing. The jury also found that ASRC interfered with the contract. A judgment was entered for Jack White of $102,000, six percent of the sale price.

Frontier and ASRC moved for a new trial claiming that the trial judge's ex parte contact with the jury was prejudicial error. The motion was denied.

Jack White sought attorney's fees and paralegal expenses. The trial court specifically found that there was no reason to vary from the Civil Rule 82 schedule and awarded attorney's fees of $15,324.75. On January 3, 1988, the court reconsidered and held that Jack White was entitled to scheduled attorney's fees separately from both Frontier and ASRC. On reconsideration the court also granted 100 percent of Jack White's paralegal expenses.

Frontier and ASRC appeal.

## DISCUSSION

### A. *Denial of the Motions for Directed Verdict*

The standard of review of denials of directed verdicts is deferential. "Our standard of review for a directed verdict is to determine whether the evidence, and all reasonable inferences which may be drawn from the evidence, viewed in the light most favorable to the non-moving party, permits room for diversity of opinion among reasonable jurors." *City of Delta Junction v. Mack Trucks, Inc.*, 670 P.2d 1128, 1130 (Alaska 1983).

#### 1. Sold or Transferred

Frontier contends that the property was not "sold or transferred" until after August 11, 1987, the last day of the exclusive listing agreement. Frontier notes that a written agreement for the sale was not signed until August 18; that the agreement was subject to approval by the ASRC board of directors, which did not approve it until August 19; and the transaction was not consummated until October 9, when the purchase price was paid and the deed was executed and delivered. Implicit in Frontier's argument is the contention that no sale took place within the meaning of the exclusive listing agreement unless Frontier made a legally enforceable agreement of sale within the contract period.

▮ Jack White argues that all the important terms of the sale were agreed to on August 5, 1987. There is ample evidence supporting that conclusion. Thus the question presented is whether the term "sold or transferred" used in the listing agreement is broad enough to cover an oral agreement which may not be legally enforceable because of the statute of frauds, but which is consummated after the expiration of the listing period. We answer that question in the affirmative.

In *Hazell v. Richards*, 659 P.2d 575, 577 (Alaska 1983), we recognized as a general proposition the validity of the argument that "a property is 'sold' within the meaning of a listing agreement when an earnest money contract is signed, regardless of whether the sale closes prior to the expiration of the listing agreement, so long as it at some time results in a completed transaction." Earnest money agreements come in various forms. Sometimes they are legally binding on both the seller and the buyer; in other forms they are only an option to buy, that is, they are not legally enforceable against a buyer. We did not in *Hazell* address the question of whether an earnest money contract which was legally unenforceable against a prospective buyer would suffice as a "sale" under a listing agreement, assuming that the option was eventually exercised.

That question was, however, addressed by the Supreme Court of Oregon in *Dean Vincent, Inc. v. Chef Joe's, Inc.*, 273 Or. 814, 541 P.2d 469 (1975). The Oregon court recognized that the earnest money agreement may not have been legally enforceable against the buyer. It nonetheless held that the sale took place when the earnest money agreement was made, if it was eventually consummated:

> The construction of the clause which would most fulfill the purpose for which it was intended is that the plaintiff is entitled to a commission if the defendant enters into an earnest money agreement within the exclusive period and that agreement at some time results in a completed transaction. We hold that is the correct interpretation. A construction to the contrary would encourage chicanery to circumscribe the exclusive feature of the listing agreement.

*Id.* 541 P.2d at 471.

Other courts have applied the same rule to agreements for the purchase of real

estate which were not enforceable against the prospective purchaser because they were oral. *Covino v. Pfeffer,* 160 Conn. 212, 276 A.2d 895, 897 (1970) ("During the life of an exclusive sale contract, an agreement between the owner and the ultimate purchaser to sell and buy, whether or not specifically enforceable, gives rise to a cause of action on the part of an exclusive broker.... To place any other interpretation on the meaning of 'sale' in an exclusive sale contract would encourage connivance."); *Bolger v. Danley Lumber Co.,* 77 Ill.App.3d 207, 32 Ill.Dec. 685, 395 N.E.2d 1066, 1069 (1979); *Great Falls Properties, Inc. v. Professional Group, Ltd.,* 649 P.2d 1082, 1085 (Colo.1982) ("Sells" used in listing agreement "refers to any agreement of purchase and sale entered into during the listing period even though actual transfer of title does not take place until the listing has expired," including verbal agreement which might be void for noncompliance with the statute of frauds).

We agree with the above authorities. It follows that the trial court did not err in refusing to direct a verdict on the issue of whether the property was sold while the listing agreement was in effect.

## 2. Good Faith and Fair Dealing

Frontier also argues that the trial court erred in refusing to direct a verdict on the issue of whether Frontier was guilty of a breach of the implied covenant of good faith and fair dealing. It is, however, unnecessary to decide this issue because the jury's conclusion in the special verdict that Frontier sold the property within the contract period is independently sufficient to support the jury award.

## 3. Intentional Inducement of Contract Breach

ASRC moved for a directed verdict on the issue of whether it tortiously interfered

with the exclusive listing contract between Frontier and Jack White. This motion was denied and the jury concluded in the special verdict that ASRC intentionally interfered with Jack White's contractual relationship with Frontier.

We have listed the elements of an intentional interference claim as follows:

> [P]roof that (1) a contract existed, (2) the defendant [ASRC] ... knew of the contract and intended to induce a breach, (3) the contract was breached, (4) defendant's wrongful conduct engendered the breach,· (5) the breach caused the plaintiff's damages, and (6) the defendant's conduct was not privileged or justified.

*Knight v. American Guard & Alert, Inc.,* 714 P.2d 788, 793 (Alaska 1986).

■ We conclude, for the reasons that follow, that the inducement and wrongful conduct elements of an intentional interference tort were not proven. It appears that Frontier suggested that the transaction not be finalized until after the listing period expired. ASRC did no more than assent to that suggestion, knowing that Frontier's purpose was to avoid paying Jack White a commission. In *Knight v. American Guard* we held that a directed verdict on an intentional interference claim was properly granted in favor of a defendant who acquiesced in a breach of contract by one of the contracting parties, but did not instigate it. *Id.* at 793–94.[3]

■ In essence, ASRC's conduct was nothing more than acquiescence in Frontier's breach of contract. This does not provide a sufficient basis for a finding of intentional interference with contract. *See, e.g., Corinthian Corp. v. White & Bollard, Inc.,* 74 Wash.2d 50, 442 P.2d 950, 957 (1968) ("[Defendant's] action did not have

**3.** *See also Prosser and Keeton on The Law of Torts* § 129 at 989–90 (P. Keeton 5th ed. 1984) (footnotes omitted):

> In order to be held liable for interference with a contract, the defendant must be shown to have caused the interference and the loss. Sometimes it is said that the defendant must have played an active and substantial part in the loss. It is not enough that he merely has

> reaped the advantages of the broken contract after the contracting party has withdrawn from it of his own motion. Thus acceptance of an offered bargain is not in itself inducement of the breach of a prior inconsistent contract, and it is not enough that the defendant has done no more than enter into one with knowledge of the other....

the requisite quality of inducement. Its participation was merely an acceptance of an offer. [Defendant's] participation was not the 'moving force' in the breach, and therefore did not amount to a tortious interference." (citations omitted)); *Middleton v. Wallichs Music & Entertainment Co.*, 24 Ariz.App. 180, 536 P.2d 1072, 1075 (1975) ("The mere fact that [defendant] contracted with the lessor with knowledge of the existence of the restrictive [competition] covenant and its possible breach by lessor in entering into the subsequent lease with [defendant], is not ... the equivalent of improper inducement."); *Baker v. Carpenter*, 33 Colo.App. 139, 516 P.2d 459, 461 (1973) ("[O]ne does not induce a seller to breach a contract with a third person when he merely enters into an agreement with the seller with knowledge that the seller cannot perform both it and his contract with the third person. In order to establish the alleged tort, a plaintiff must prove, *inter alia*, that the actions of the defendant actually induced a breach of the contract.").

Jack White cites three cases which it contends indicate that denial of a directed verdict was proper. We disagree and believe that each of the cases is distinguishable in an important way. The first case, *Boyles v. Thompson*, 585 S.W.2d 821 (Tex. Civ.App.1979), involved a relatively unusual situation in which the buyer disliked the broker personally and for that reason suggested to the seller a transaction which would eliminate the broker's commission. *Id.* at 826 & 837. There is no such motivating animus in this case. Furthermore, ASRC's knowing acceptance of Frontier's breach is a far cry from Boyles' active encouragement of the breach. The second case, *Community Cablecasting Corp. v. Daniels & Assocs. Inc.*, 215 So.2d 17 (Fla. App.1968), *cert. denied*, 225 So.2d 533 (Fla. 1969), is better authority for Jack White. However, although the facts are not stated

in detail, it appears that the purchaser affirmatively arranged an attempted deception of the broker by postdating the sale contract. *Id.* at 18. In the present case, ASRC engaged in no similar conduct which might be characterized as wrongful. The third case which Jack White cites is *Bolger v. Danley Lumber Co.*, 77 Ill.App.3d 207, 32 Ill.Dec. 685, 395 N.E.2d 1066 (1979), where summary judgment had been rendered in favor of the buyer on the basis that there was no factual issue as to whether the buyer had knowledge of the brokerage contract. The court reversed summary judgment, holding that there was a question of fact as to the buyer's knowledge. *Id.* 32 Ill.Dec. at 688, 395 N.E.2d at 1069. The court did not state that knowledge alone was sufficient for entry of judgment against the buyer, nor did the court purport to analyze what additional elements would have to be proved in order to establish a case of intentional interference against the buyer. The case, therefore, does not support Jack White's position.

## B. *In–Court Discussion of the Frontier/ASRC Settlement Agreement*

■ In settling their third-party claims, Frontier and ASRC agreed to share all liability to Jack White. Jack White attempted to introduce the settlement agreement and evidence of the related negotiations at trial, but the court refused to allow it. Jack White was, however, permitted to cross-examine Frontier and ASRC about the settlement, and discuss it in front of the jury.[4] The trial court allowed the settlement agreement to be discussed at trial on the grounds that it was useful in showing bias or prejudice of ASRC and Frontier representatives. Frontier, however, contends that because the parties to the settlement agreement were also parties to the action, the jury was aware that the witnesses were biased.

**4.** In closing argument Jack White's counsel said: [Frontier and ASRC] have incentives to make sure that they're working together.... [T]hey have to, in a sense, make sure their testimony lines up. Why? Because if Frontier—if you

decide that Frontier is in the wrong, then Arctic Slope has to pay half. If you decide Arctic Slope—(indiscernible)—responsibility to what Arctic Slope's done in this case, Frontier has to pay half.

Evidence Rule 408 specifically allows the use of settlement agreements to show witness bias.[5] While it is true that ASRC's and Frontier's status as parties would suggest to the jury that their representatives might be biased in favor of the party employing them, that bias does not necessarily carry over to the co-defendant. Because of the agreement, ASRC representatives might be motivated to slant their testimony in Frontier's favor and vice-versa. The trial court did not err in allowing the testimony.

### C. Ex Parte Contact by Trial Judge with the Jury

Frontier asserts that the trial court's ex parte contact with the jury was error and a new trial is required. During its deliberations, the jury sent the following question to the court:

There is a question in regard to the validity of the contract: Exhibit 10

\* \* \* \* \* \*

Contract says:

Agent agrees to use diligence in procuring a purchaser and submit this listing to the multiple listing service within seventy-two hours.

Since it was not sent within seventy hours do we have the option of considering the contract null and void[?]

The court responded "No." Counsel was not notified of the question or the answer. The court later explained: "Given that the case had no claim that the contract should be rescinded or otherwise considered 'null and void', ... the answer was given to the jury without counsel being called."

■ We have not previously addressed the proper remedy for ex parte contact between the judge and jury in a civil case,

although the rule in criminal cases is clear. We have expressly rejected a per se reversibility standard; instead, we apply a "harmless beyond a reasonable doubt" standard with the state bearing the burden of proving harmlessness. *Dixon v. State*, 605 P.2d 882, 884 (Alaska 1980); *see also Wamser v. State*, 652 P.2d 98 (Alaska 1982); *Noffke v. State*, 422 P.2d 102 (Alaska 1967). The United States Supreme Court has also indicated that ex parte communication between a judge and jury may sometimes be harmless error in a criminal trial. *Rogers v. United States*, 422 U.S. 35, 40, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975). The standards of evaluating ex parte contact need not be as high in civil as in criminal cases since the right of the accused to be present at every stage of a criminal trial has constitutional status,[6] and there is no similar protection on the civil side.

While it has not been universally rejected, most courts do not apply a per se reversibility standard when there have been ex parte contacts between judge and jury in a civil trial. For example, in *Petrycki v. Youngstown & Northern R.R.*, 531 F.2d 1363 (6th Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 138 (1976), the court held "[C]ommunications between a judge and a jury, without notice to counsel, constitute reversible error[, however,] a court's ex parte communication with the jury will not require reversal where substantive rights of parties have not been adversely affected." *Id.* at 1366–67 (citations omitted). The court applied a harmless error standard, found that the error in question was not harmless, and ordered a new trial.[7]

The Ninth Circuit has also applied a harmless error test. *Dixon v. Southern*

**5.** Rule 408 provides:

Evidence of (1) furnishing or offering or promising to furnish or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.... This rule ... does not require exclusion when the evidence is offered for

another purpose, such as proving bias or prejudice of a witness....

**6.** This right is derived from the confrontation and due process clauses of the Alaska and United States Constitutions. *Dixon*, 605 P.2d at 884 & n. 3.

**7.** The judge's response to the jury's question regarding the maximum amount of damages the jury could award was factually incorrect.

*Pacific Transp. Co.*, 579 F.2d 511 (9th Cir. 1978). In deciding that the error was harmless it was important to the court that the judge's answer was "indisputably correct." *Id.* at 514; *see also Acree v. Minolta Corp,* 748 F.2d 1382, 1386 (10th Cir. 1984) (although the court's ex parte response to a jury's question regarding the losses for which they could properly award damages is error, reversal is only necessary if the error affected substantial rights).

We agree with these authorities and will apply a harmless error standard to this case. Frontier, as the party alleging error, bears the burden of proving both error and harm. *See Poulin v. Zartman,* 542 P.2d 251, 261 (Alaska 1975); *Zerbinos v. Lewis,* 394 P.2d 886, 889–90 (Alaska 1964).

 The trial court's response to the jury was error. Clearly, the court should have consulted counsel and given them an opportunity to be heard before answering the jury. However, Frontier has not proven that this error was prejudicial. Prejudicial error can frequently be proven by showing that the judge's ex parte response was legally or factually incorrect. *See, e.g., Petrycki,* 531 F.2d at 1367. The court's response in this case was neither. Therefore, we conclude that a new trial is not required.

### D. *Attorney's Fees*

In response to Jack White's request for attorney's fees, the court initially found that there was no reason to deviate from the schedule contained in Civil Rule 82(a)(1) and awarded fees according to the schedule. The court subsequently reconsidered and held that Jack White was entitled to scheduled attorney's fees separately from both Frontier and ASRC, in effect doubling Jack White's fee recovery.

Even though the decision of the trial court regarding attorney's fees is given great deference, *City of Valdez v. Valdez Development Co.,* 523 P.2d 177, 184 (Alaska 1974), we have routinely held that "the trial court should state its reasons when it makes an award of attorney's fees which varies from the schedule in Rule 82(a)(1)."

*Miller v. McManus,* 558 P.2d 891, 893 (Alaska 1977); *Farnsworth v. Steiner,* 601 P.2d 266, 272 (Alaska 1979).

 The trial court erred in ordering both defendants to pay Jack White's scheduled attorney's fees. To reach the fee figure of $15,324.75 that was subsequently doubled the trial court used Jack White's total judgment. Frontier and ASRC were jointly liable for this amount; Jack White basically recovered one amount, the commission, using two theories against two defendants. By doubling the schedule figure because there were two defendants, the court in essence used a much higher judgment than the jury found appropriate. The court abused its discretion by deviating from the Rule 82 schedule without explaining its reasons.

Because the judgment against ASRC must be reversed, the court's error regarding attorney's fees should be remedied by vacating the fee award against ASRC. On remand the court may make an attorney's fee award in favor of ASRC.

### E. *Costs*

 The court awarded Jack White its full paralegal expenses as costs citing *CTA Architects v. Active Erectors & Installers, Inc.,* 781 P.2d 1364 (Alaska 1989). Cost awards will be affirmed unless there has been a clear abuse of discretion. *Kaps Transport, Inc. v. Henry,* 572 P.2d 72, 77 (Alaska 1977). This award was not an abuse of discretion and so it is affirmed as to Frontier. As to ASRC, it is reversed, along with the judgment on the merits.

The judgment of the superior court is AFFIRMED as to Frontier, REVERSED as to ASRC, and REMANDED for further proceedings.