**Henry E. BRIGDON and Margaret Brigdon, Petitioners,**

v.

**Michael A. LAMB and Cynthia E. Johnson–Lamb, Respondents.**

No. S–7006.

Supreme Court of Alaska.

Jan. 3, 1997.

---

Paul W. Waggoner, Anchorage, for Petitioners.

Sarah J. Tugman, Anchorage, for Respondents.

Before COMPTON, C.J., RABINOWITZ, MATTHEWS and EASTAUGH, JJ., and CARPENETI, J. Pro Tem.*

*OPINION*

MATTHEWS, Justice.

Michael and Cynthia Lamb occupied a house owned by Henry and Margaret Brigdon from August 22, 1991 to April 30, 1993. The Lambs have sued the Brigdons and others, claiming that they were injured by carbon monoxide fumes emitted from a defective furnace during the period of their occupancy until the furnace was finally replaced on February 6, 1993.

One count of their complaint alleged that Alaska's Uniform Residential Landlord and Tenant Act (URLTA), AS 34.03.010 et seq., applies, and that the Brigdons breached the duties imposed by the act on residential landlords to maintain heating facilities in safe working order and to keep premises in a fit

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

and habitable condition.[1] In response, the Brigdons alleged that their relationship with the Lambs was that of seller and buyer and thus the act does not apply. The parties made cross motions for partial summary judgment on this point. The superior court denied the Brigdons' motion and granted that of the Lambs.

The Brigdons petitioned for review from this order. We granted their petition and now reverse. Specifically, we hold that the Lambs were occupants under a contract of sale until approximately February 21, 1992, when the denial of their application to assume a loan secured by the house was communicated to them. For the period that followed, factual questions preclude summary judgment as to whether the Lambs occupied the house as tenants or under a contract of sale.

The following facts are undisputed. The Brigdons listed their house for sale with Chelsea Realty. The Lambs signed a "Receipt and Agreement to Purchase" and an "Occupancy Agreement" on July 27, 1991. The former document was superseded by another Receipt and Agreement to Purchase signed by the Lambs on August 10, 1991. These agreements were signed by the Brigdons, who do not reside in Alaska, on September 6, 1991. Under the agreement to purchase the Lambs agreed to buy the house for $93,250, including an assumption of the existing loan secured by the property in the amount of $91,000. The holder of the loan was the Kodiak Island Housing Authority (KIHA). The source of funds for the loan was the Department of Community and Regional Affairs of the State of Alaska (DCRA). The agreement to purchase required the Lambs to apply for approval of their assumption of the loan, and further provided that if they failed to qualify for the assumption

within ninety days the agreement to purchase would "be terminated and of no further force and effect."

Under the occupancy agreement the Lambs agreed to pay $986 per month. Checks were to be made payable to KIHA and delivered to Chelsea Realty.[2] The monthly occupancy payment was nearly the same as the monthly payment due from the Brigdons to KIHA on the secured loan. The occupancy agreement provided that it "is not to be construed as a rental or lease agreement."

The Lambs' assumption of the secured loan was neither approved nor disapproved within ninety days. However, the parties agreed to waive the ninety-day deadline and signed an addendum to the agreement to purchase extending the deadline for approval of the assumption to April 22, 1992.

On February 5 and again on February 13, 1992, DCRA wrote KIHA denying the Lambs' application to assume the loan. The February 13 letter stated:

> DCRA is willing to rent the subject property to the Lambs for one year and at that time, if they can continue to pay their rent and all their debts in a timely fashion, we will finance the subject home.

Chelsea was notified on February 21, 1992, of the requirement that the Lambs rent for one year before the assumption could be approved. Chelsea, in turn, seems to have promptly passed on this information to the parties. Thereafter, Chelsea prepared and the Brigdons signed a proposed addendum to the agreement to purchase which would have extended it until March 1, 1993. The Lambs received the addendum, did not sign it, and made no comment concerning it. However, the Lambs continued to occupy the house, continued to make the payments called for

---

1. AS 34.03.100(a) provides in part: "The landlord shall (1) make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition; ... (3) maintain in good and safe working order and condition all ... heating, ventilating ... and other facilities ... supplied or required to be supplied by the landlord...."

2. The Brigdons and the Lambs have included two slightly different occupancy agreements as part of the record. One provides for payment to KIHA and Kodiak Island Borough and the other provides for payment to Chelsea Realty.

under the occupancy agreement, and, on January 29, 1993, tendered a check of $100 to KIHA for a credit check as a needed step toward obtaining approval of their assumption of the loan.

At some time in late January of 1993, the Lambs were advised that the furnace in the house was defective and had been emitting carbon monoxide fumes. In March they made a new offer to purchase the house, contingent on nonwaiver of their rights to sue for injury caused by the carbon monoxide fumes. This offer was not accepted and the Lambs moved out on or about April 30, 1993.

The issue before the court is whether the URLTA applies to the relationship between the Lambs and the Brigdons. Alaska Statute 34.03.330 defines the scope of the act. In relevant part this section states:

> (a) This chapter applies to and determines rights, obligations and remedies under a rental agreement, wherever made, for a dwelling unit in this state.

> (b) Unless created to avoid the application of this chapter, the following arrangements are not governed by this chapter:
>
> . . . .
>
> (2) occupancy under a contract of sale of a dwelling unit or the property of which it is a part, if the occupant is the purchaser or a person who succeeds to the interest of a purchaser. . . .

The Brigdons argue that the Lambs occupied the house under a contract of sale and thus the URLTA does not apply. The Lambs argue that they were not purchasers under a contract of sale at any time during the period of occupancy. Further, they argue that the occupancy agreem nt was created to avoid the application of the URLTA and thus under subsection (b) of section .330 the act applies even assuming that the Lambs occupied the premises under a contract of sale.

■ We observed in *Frontier Companies of Alaska, Inc. v. Jack White Co.*, 818 P.2d 645, 649 (Alaska 1991), that earnest money agreements come in various forms. "Sometimes they are legally binding on both the seller and the buyer; in other forms they are only an option to buy, that is, they are not legally enforceable against a buyer." *Id.* The receipt and agreement to purchase signed by the parties in this case is a type of earnest money agreement. Approval of the loan assumption was a condition which qualified the Lambs' duty to close the deal. Its non-occurrence excused them from doing so. However, a valid and binding contract of sale may contain a condition and the inclusion of one here did not operate to render the agreement to purchase a mere option to buy. *See* Restatement (Second) of Contracts § 224 cmt. a, illus. 1 (1981). An option contract places no obligation to purchase on the holder of the option. *See* Eric M. Holmes & Joseph M. Perillo, 3 *Corbin on Contracts* § 11.1 (revised ed. 1996). Here, the Lambs were required to apply for approval of the loan assumption and to "close this transaction" upon approval of the loan assumption. The contingency of the approval of the loan assumption did not prevent the "Receipt and Agreement to Purchase" from qualifying as a "contract of sale" within the meaning of AS 34.03.330(b)(2). *See* John E. Murray, Jr., *Murray on Contracts* § 99(B) (3d ed. 1990).

■ The Lambs' argument that the occupancy agreement was created to avoid the application of the URLTA is without any factual support in the record. Thus we have no difficulty in concluding that until the parties were told that the Lambs' application to assume the loan had been rejected the parties were not subject to the URLTA. Until then the Lambs were occupying as purchasers under a contract of sale, and the contract was not created to avoid the application of the URLTA.

■ With respect to the Lambs' occupancy after being notified that their assumption application had been rejected, questions of fact exist as to whether they continued to occupy under a contract of sale. On April 13, 1992, the Brigdons signed an addendum to the purchase agreement that would have ex-

tended it to March 1, 1993. Chelsea forwarded this to the Lambs. The Lambs did not sign it. All we know about the circumstances surrounding the Lambs' failure to sign the addendum is set forth in Cynthia Lamb's affidavit. She states:

> I purposely and intentionally refused to sign the Addendum which is dated April 13, 1992 at the top. Chelsea never inquired of me as to why I would not sign it. Because they never got it back signed, I assumed they would know that we did not agree to sign anything more that they gave us.

The Brigdons argue that despite the fact that the Lambs did not sign the addendum of April 13, 1992, they accepted it, or elected to continue the existence of the agreement to purchase, by their silence, by their conduct in continuing to occupy the house under the occupancy agreement, and in furthering the purchase by submitting the $100 check to KIHA on January 29, 1993. The Lambs contend that there was no acceptance and thus the purchase agreement did not remain in effect.

We agree with the Brigdons that it is possible to interpret these events as acceptance of the addendum or an affirmation of the continuing existence of the purchase agreement. *See, e.g.,* Restatement (Second) of Contracts § 69(1):

> Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases only: .... (c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

*See also* John D. Calamari & Joseph M. Perillo, *Contracts* § 2–19, at 89:

> [A] contract implied in fact arises under circumstances which, according to the ordinary course of dealing and common understanding of men, show a mutual intention

to contract.... A contract is implied in fact where the intention is not manifested by direct or explicit words between the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction.

(Citations omitted.) *And see id.* § 11–32, at 496:

> An election may be shown by promise or by conduct. Conduct basically will take one of two forms. One, where the innocent party continues his own performance after failure of condition, ... the other where he allows the other party to continue his performance....

(Citations omitted.)

Whether the addendum became effective or the Lambs elected to continue the existence of the contract are questions which cannot be resolved on this record.[3] Thus summary judgment in favor of the Lambs for the period after their assumption application was rejected was inappropriate.

For the above reasons we conclude that the court erred in granting partial summary judgment to the Lambs. The Brigdons were entitled to partial summary judgment on the issue of the application of the URLTA until the date on which the denial of the assumption application was communicated to the parties. Thereafter, questions of fact exist as to whether the agreement to purchase was extended.

REVERSED and REMANDED for further proceedings consistent with this opinion.

CARPENETI, J. Pro Tem., dissents in part.

CARPENETI, Justice Pro Tem., dissenting in part.

I agree with all aspects of the court's resolution of this appeal but one: the court's

---

**3.** "Whether a promise will be implied under particular circumstances is ordinarily a question of

fact." Calamari & Perillo, *supra,* § 2–19, at 89.

grant of summary judgment in favor of the Brigdons on the issue of the application of the URLTA until the date on which the denial of the assumption application was communicated to the parties. This grant rests on the court's conclusion that "[t]he Lambs' argument that the occupancy agreement was created to avoid the application of the URLTA is without any factual support in the record." Op. at 1277. It is this conclusion with which I disagree.

In reviewing a grant of summary judgment this court determines "whether there was a genuine issue of material fact and whether the moving party was entitled to judgment on the law applicable to the established facts." *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985) (quoting *Brock v. Alaska Int'l Indus.*, 645 P.2d 188, 190 n. 6 (Alaska 1982)). To successfully oppose a summary judgment motion,[1] a party must "demonstrate that a genuine issue of fact exists to be litigated by showing that it can produce admissible evidence reasonably tending to dispute the movant's evidence." *French v. Jadon, Inc.*, 911 P.2d 20, 23 (Alaska 1996).

The Lambs did produce admissible evidence disputing the Brigdons' claim that the occupancy agreement was not created to avoid the application of the URLTA. A trier of fact may ultimately be unpersuaded by this evidence. However, that is not the question. The question is whether there are any facts in the record which support that conclusion. It appears to me that there are.

First, immediately prior to their experience with the Lambs, the Brigdons had "buyer-seller" relationships with at least three potential buyers, two of whom occupied the house for varying periods of time but none of whom were able to complete the purchase. The Brigdons collected monthly payments resembling rent over a sizable time period[2] from these potential buyers, but incurred none of the responsibilities of landlords. This at least suggests a pattern of structuring these relationships to avoid such responsibilities.

Second, following the failure of the condition that the Lambs obtain financing, the Brigdons acted in ways consistent with the conclusion that they had structured the agreement to avoid the URLTA: They repeatedly extended (and then offered to extend) the period for the Lambs to obtain financing, thus purporting to keep alive a "buyer-seller" relationship which bore all the earmarks of a tenant-landlord relationship.

Third, the Lambs, "buyers" in name, earned no equity in the property for the monthly contract payments which they made and obtained none of the tax benefits of ownership. The Brigdons, the "sellers," continued to accumulate equity in the property, claimed the mortgage interest deduction on their income tax return (about $18,000 for the two years in question), and maintained "landlords' package policies" on the property during the entire period of the Lambs' occupancy.

Finally, the house was in a deteriorated condition,[3] which heightened the financial risk to the Brigdons of having tenants (as opposed to purchasers) occupying the property.

Contrary to the Brigdons' assertions, the above facts all suggest that the occupancy agreement was "created to avoid the application of" the URLTA. Because there remain questions of fact regarding the Brigdons' in-

---

1. The trial court granted summary judgment to the Lambs on this issue. The court today not only reverses the grant of summary judgment to the Lambs, but awards summary judgment to the Brigdons.

2. The Brigdons collected payments for at least fourteen months between September 1988 and June 1990.

3. When the previous "buyer" had left, the Kodiak Island Housing Authority noted that the house was in "very poor condition" and that Mr. Brigdon had stated that if the house could not be rented within the month that he would have to default on his loan. The Brigdons were aware of the condition of the house, and were marketing it as a "fixer-upper" property.

tent to circumvent the URLTA with the occupancy agreement, I would leave this matter for resolution by the jury.