Michael PETRYCKI, Plaintiff-Appellee,

v.

YOUNGSTOWN AND NORTHERN RAILROAD COMPANY, Defendant-Appellant.

No. 75–1371.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 15, 1975.

Decided March 23, 1976.

Rehearing Denied May 7, 1976.

---

Charles F. Clarke, James P. Murphy, Squire, Sanders & Dempsey, Cleveland, Ohio, Michael I. Walling, Youngstown, Ohio, for defendant-appellant.

Francis H. Monek, John J. Naughton, Chicago, Ill., William M. Collins, Youngstown, Ohio, for plaintiff-appellee.

Before WEICK, Circuit Judge; LIVELY, Circuit Judge, and MARKEY, Chief Judge, United States Court of Customs and Patent Appeals.[*]

MARKEY, Chief Judge.

This appeal is from a judgment entered in the District Court upon a jury verdict in favor of the plaintiff in an action for damages for personal injuries brought under the Federal Employers' Liability Act, 45 U.S.C. §§ 50 *et seq.*, and the Federal Safety Appliance Act, 45 U.S.C. §§ 1 *et seq.* We reverse the judgment of the District Court and remand the case for a new trial.

### Facts

Plaintiff-appellee, Petrycki, was employed by appellant-defendant, the Youngstown & Northern Railroad Company. On August 25, 1971, the day on which Petrycki claimed to have been injured, he was working, under the supervision of the conductor, as the rear brakeman of a crew switching cars in the MacDonald Works Yard near Youngstown, Ohio. The complaint alleges that a coupling failed twice because the drawbars of the couplers were out of alignment.

After a second unsuccessful attempt to couple the cars, the conductor went between the cars to correctly position the drawbar on the standing cut of cars. While the conductor was in that position, the cars rolled back upon him, crushing his hand in the couple. The conductor called to Petrycki to signal the train operator to move the cars. Petrycki claims that the train crew did not immediately respond to his signals and that he was thus caused to rush about in various directions, attempting to have his signals acted upon, producing exhaustion and physical activity which, in turn, produced his heart attack some five days after the accident involving the conductor. Petrycki's fellow switching crew members apparently had no knowledge of his alleged anxiety and were unable to corroborate certain of his claimed activities immediately after the injury to the conductor. Petrycki drove his car home from work following the accident. He returned to work the next day, a Thursday, and worked on Friday. Saturday and Sunday were his regular days off. He testified that during those few days he was trying to get the picture of the conductor's mangled hand out of his mind; that thinking of it made him sick; that he had trouble sleeping; and that he was perspiring and trembling continuously.

Nevertheless, Petrycki returned to work the following Monday. After about three hours on the job, Petrycki experienced severe chest pains and difficulty in breathing. He lay down until quitting time, when he drove himself home and went to bed. The next day, Petrycki consulted his family physician, Dr. Joseph S. Gregori, who arranged his admission to St. Elizabeth's Hospital that same day. Petrycki gave a history of his ailments to Dr. Gregori as well as to the admitting doctor at the hospital. That history, as contained in the hospital records, reveals nothing about the incident in the railroad yard five days earlier, which is now claimed as the cause of Petrycki's heart attack. Instead, it sets forth that he experienced pains in the region of his heart one month previous while he was in his garden

---

[*] The Honorable Howard T. Markey, sitting by designation.

and that there was a similar episode on the day prior to his admission to the hospital. The relevant portion reads as follows:

HISTORY: This patient presented with history of retrosternal discomfort 1 month previous with pain radiating to the left arm. It was associated with transient shortness of breath and nausea. It lasted ¾–1 hour. There was recurrence of similar episode on the day prior to admission that persisted more or less throughout the night.

EKG taken at the doctor's office showed marked change to that taken 2 years prior. The EKG showed inverted T waves in leads 2, 3, AVF, and Q waves also in 2, 3, and AVF and V3 to V6.

The patient also complained of increasing exertional dyspnea for 6–9 months. There was no history of ankle edema.

Petrycki remained in the hospital from the day of his admission, August 31, 1971, until September 10, 1971. In November, 1971 he was readmitted to the hospital for an arteriogram which disclosed advanced arteriosclerosis of the three major blood vessels of his heart. Surgery performed in December, 1971 involved the removal of the three badly diseased major arteries and their replacement with veins taken from his legs. The operation is described as bilateral aorta right, aorta left, coronary vein by-pass graft, cardiopulmonary by-pass.

The railroad admitted that the conductor was caught between the two cars, but denied all allegations of fault with respect to Petrycki's claimed injury or disease. During the trial, expert testimony was offered on behalf of both parties regarding the cause of Petrycki's heart attack. Dr. Gregori and Dr. Bernard L. Charms, an expert cardiologist, were Petrycki's witnesses. Dr. Gregori testified that it was probable that an episode such as that experienced by Petrycki in the railroad yard could have precipitated a heart attack or heart failure. Dr. Charms saw Petrycki about two weeks before trial, and thus well after the heart surgery had been performed. He was of the opinion that Petrycki's heart disease had developed over a period from twenty to thirty years, and that because of this condition, exertion and fright could trigger blood-clots which could result in a heart attack. Dr. Charms, however, also admitted that if Petrycki had been his patient after the incident in the garden, he probably would have performed an EKG and if it showed an acute myocardial infarction he would not have permitted Petrycki to return to work. The railroad's only medical witness was Dr. Elias T. Saadi, who had been called in by Dr. Gregori for consultation regarding Petrycki's condition in September of 1971. It was Dr. Saadi's opinion that Petrycki's heart attack took place 24 to 48 hours before entering the hospital and did not occur as a result of the railroad accident. Dr. Saadi was also of the view that Petrycki suffered a moderate heart attack while in his garden a month prior to his admission to the hospital. He also gave his opinion that Petrycki did not suffer any heart attack at the railroad yard on August 25th.

The court declined to give an instruction requested by Petrycki's counsel on the *ad damnum* clause of the complaint, stating the laudatory policy of avoiding a statement to the jury of the amount prayed for, which has no evidentiary value whatsoever.

After four days of trial the case was submitted to the jury. Having deliberated for a short while, the jury submitted the following question to the court in writing:

Are we correct in understanding we may award only up to the amount asked for by the plaintiff and, if so, is the figure $205,000 quoted as the maximum?

The judge's written response was:

The prayer of the complaint set forth the maximum amount that may be awarded. The prayer is for $250,000.

This correspondence did not take place in open court and was in the absence of counsel and without their knowledge. Counsel therefore had no opportunity to object to the court's answer nor to make suggestions regarding an appropriate instruction.

The attorneys were outside the courtroom and were advised by a court attendant that

the jury had just reached a verdict; they went into the courtroom where the court told them what had taken place in their absence, as follows:

(Thereupon the following proceedings were had in the courtroom immediately prior to the jury returning its verdict:)

The Court: The jury sent out a note and, frankly, I did not discuss this with counsel because the note reveals something which is more or less an indication of who the verdict is for. But what I did, I sent back a note to the jury in response to the question, and I put it on the record at the time. The note from the jury reads:

"Are we correct in understanding we may award only up to the amount asked for by the plaintiff and, if so, is the figure $205,000 quoted as the maximum?"

I wrote back and said:

"The prayer of the complaint sets the maximum amount as $250,000."

Now, I wasn't in any position to discuss this with you gentlemen because it did reveal some of their thinking in the back room.

So I do want to inform you about that and I put it on the record at the time, contrary to my policy to ever instruct a jury anything when counsel isn't present; but I felt under the circumstances I couldn't very well.

(At this point, the jury returned to the courtroom with their verdict.)

(Thereupon Court was adjourned.)

The jury's verdict was for $247,400. Motions for judgment notwithstanding the verdict and for a new trial were denied.

### Issue

We find it necessary to consider only whether the effect of the District Court's having answered the sequestered jury's question, without prior notice to counsel, was such as to render that action reversible error.[1]

### OPINION

■ The Supreme Court has recently affirmed the basic proposition that communications between a judge and a jury, without notice to counsel, constitute reversible error. *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). In *Rogers* defendant's conviction for threatening the life of the President was reversed because the trial judge failed to respond adequately in open court and in the presence of counsel to a jury communication asking whether it could return a verdict of "[g]uilty as charged with extreme mercy of the Court."

The same rule applies equally to civil actions and criminal cases and is illustrated by the reliance in *Rogers* upon *Fillippon v. Albion Vein Slate Co.,* 250 U.S. 76, 39 S.Ct. 435, 63 L.Ed. 853 (1919), a civil action. Chief Justice Burger, writing for the Court in *Rogers,* stated:

In *Fillippon v. Albion Vein Slate Co.,* 250 U.S. 76, 39 S.Ct. 435, 63 L.Ed. 853 (1919), the Court observed "that the orderly conduct of a trial by jury, essential to the proper protection of the right to be heard, entitles the parties who attend for the purpose to be present in person or by counsel at all proceedings from the time the jury is impaneled until it is discharged after rendering the verdict." *[Id.]* 250 U.S. at 81, 39 S.Ct. at 436. In applying that principle, the court held that the trial judge in a civil case had "erred in giving a supplementary instruction to the jury in the absence of the parties and without affording them an opportunity either to be present or to

---

1. It is not necessary for us to consider the Railroad's motion for judgment notwithstanding the verdict because in the conclusion of both of its briefs the only relief sought was reversal of the order of the trial court overruling the motion for a new trial on all issues of the case. See Rule 28(b) Fed.Rules App.P. Whether the Railroad is entitled to a directed verdict may be determined on the retrial of the case. Nor is it necessary for us to consider the other errors pointed out by the Railroad as they may not recur in the retrial of the case.

make timely objection to the instruction." *Ibid.* (422 U.S. at 38, 95 S.Ct. at 2094, 45 L.Ed.2d at 5)

This court has had a recent opportunity to apply the guidance provided by the Supreme Court. In *United States v. Gay,* 522 F.2d 429 (6th Cir. 1975), we said:

The Supreme Court has recently dealt with the matter of communications between a jury and the trial judge and concluded that messages from a jury should be answered in open court with an opportunity for counsel to be heard before the court responds. *Rogers v. United States,* [422] U.S. [35], 95 S.Ct. [2091] 45 L.Ed.2d 1, (1975). The holding was based upon the requirements of Rule 43 and cases decided prior to the effective date of the rules. In *Fillippon v. Albion Vein Slate Co.,* 250 U.S. 76, 81, 39 S.Ct. 435, 436, 63 L.Ed. 853 (1919), a civil action, the Court held that the parties have the right to be present in person or by counsel "at all proceedings from the time the jury is impaneled until it is discharged after rendering the verdict." In *Shields v. United States,* 273 U.S. 583, 588–89, 47 S.Ct. 478, 71 L.Ed. 787 (1927), the Court noted that *a fortiori,* the same rule would apply in a criminal case.

We hold that it was error for the District Judge to engage in discussions with members of the jury after it was impaneled and to consider requests for excuses out of the presence of the defendant and without giving notice to defense counsel.

In *Gay* we recognized that such communication may amount to harmless error:

The Supreme Court noted in *Rogers* that "a violation of Rule 43 may in some circumstances be harmless error . . ." (95 S.Ct. 2095, 43 U.S.L.W. 4765). Even though the appellant has not been able to demonstrate prejudice in the present case, the total absence of a record of the proceedings in which the changes in the makeup of the jury occurred requires us to assume prejudice.

Thus a court's ex parte communication with the jury will not require reversal where substantive rights of parties have not been adversely affected. In *Charm Promotions Ltd. v. Travelers Indemnity Co.,* 489 F.2d 1092 (7th Cir. 1973), such communications were held subject to the "harmless error" rule set forth by F.R.Civ.P. 61:

No error in . . . anything done . . . by the court . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

The action of the district court herein, answering the jury's question in the absence of counsel, took place without the benefit of the views so recently expressed by the Supreme Court in *Rogers,* and by this court in *Gay.* Had those authorities been available, we are convinced, the district court would not have considered revelation of some of the jury's thinking to have been controlling. With *Rogers* and *Gay* available, the district court would have focused on whether an answer without presence of counsel might in fact adversely effect the substantive rights of either party. We reach the conclusion that the secret communication herein was error which, absent affirmative evidence to the contrary, cannot be said to have been harmless.

The jury's inquiry herein came after the case had been submitted to the jury and during its deliberation, a crucial period in the trial process. Though the court had earlier declined to give an instruction on the *ad damnum,* it did so in response to the jury's question. In both instances counsel were denied input into any instruction on the matter. If counsel had been accorded the right to be present during the court's consideration of the jury's question, and to recommend appropriate instructions on the law applicable to the relative significance of the *ad damnum* clause in a complaint, coun-

sel might have recommended that no definitive response be made. Similarly, the railroad's counsel might well have requested the court, for example, to instruct the jury that it should not concern itself in any way with the amount prayed for in the complaint and that they should award only such damages as were actually caused by whatever negligence it may attribute to the railroad. We note, further, that counsel for Petrycki, in his closing argument to the jury, had asked for only $205,000, although the amount prayed for was $250,000. The jury's prompt return of a verdict for $247,-400, an amount only slightly below that set forth in the *ad damnum* clause, indicates strongly that the jury may well have been influenced by the instruction, at least to the· extent of $42,400.

It is true that the jury's note carried an implication that it had decided for Petrycki and was interested only in the amount it could award. Still, the jury's deliberations had not ended. It cannot be said with certainty that the jury had in fact decided for Petrycki or that any such decision, if it had been made, might not be revoked as deliberations continued. What counsel, if present, might have done and what the effect of their absence on the final verdict may have been are matters of conjecture. That such considerations raise the possibility of adverse effects upon substantive rights, and that no countervailing evidence of harmlessness is present, is sufficient, however, to require reversal. As the Supreme Court held in *Fillippon, supra:*

> [i]n jury trials erroneous rulings are presumptively injurious, especially those embodied in instructions to the jury; and they furnish ground for reversal unless it *affirmatively* appears that they were harmless. [Emphasis added.] 250 U.S. at 82, 39 S.Ct. at 437, 63 L.Ed. at 856.

The giving of a secret instruction has been held reversible error unless "it appears with certainty that no harm has been done . . . ." *United States v. Compagna,* 146 F.2d 524, 528 (2d Cir. 1944), *cert. denied,* 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422 (1945).

Because we cannot say with certainty that no harm was done in this case by the correspondence between the court and the jury, with counsel absent, we must reverse and remand for a new trial.