Garcia L. **ETHEREDGE,**
Appellant/Cross–
Appellee,

v.

**DISTRICT OF COLUMBIA,**
Appellee/Cross–
Appellant.

Nos. 92–CV–1151, 93–CV–941.

District of Columbia Court of Appeals.

Argued Sept. 24, 1993.

Decided Dec. 29, 1993.

---

Samuel M. Shapiro, with whom David C. Merkin, was on the brief, for appellant/cross-appellee.

James C. McKay, Jr., Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellee/cross-appellant.

Before STEADMAN and SCHWELB, Associate Judges, and BELSON, Senior Judge.

SCHWELB, Associate Judge:

In the early morning hours of Sunday, June 26, 1989, in the aftermath of a domestic dispute with his girlfriend, Barrie (Bambi) Kerns, Garcia L. Etheredge was shot in the back by Officer Brian Paige of the Metropolitan Police Department (MPD) at the home of Ms. Kerns' mother, Claudette Kerns, in northeast Washington, D.C. Etheredge suffered serious injuries, including partial paralysis. He brought suit against the District, alleging assault and battery, negligence, and false arrest. The case was tried to a jury beginning on April 27, 1990.

At the conclusion of the plaintiff's case and again at the close of all the evidence, the District moved for a directed verdict. The judge denied each motion,[1] and the jury subsequently awarded Etheredge $1,514,444.44 on the assault and negligence counts and an additional $10,000 on the false arrest claim.

The District filed a motion for judgment notwithstanding the verdict (n.o.v.) and, on September 2, 1992, the trial judge issued a twenty-two page memorandum opinion and order in which he granted the motion. *Etheredge v. District of Columbia,* 120 Daily Wash.L.Rptr. 2225 (Super.Ct.D.C.1992). On appeal, Etheredge contends that the evidence, viewed as it must be in the light most favorable to him, was sufficient to support the verdict and that judgment n.o.v. was improperly entered. We agree with Etheredge and vacate the judgment n.o.v. on each of the three counts.

We do not, however, reinstate the verdict, but instead remand the case for a new trial. We do so because, as the District contends in its conditional cross-appeal, the trial judge committed reversible error prejudicial to the District by suggesting, in an unrecorded *ex parte* conversation in the jury room with the foreman of the jury, that the jurors might wish to participate in a protest against the verdict in the California state court trial of officers charged with beating motorist Rodney King.

## I.

### THE EVIDENCE

*A. The Antecedent Events.*

On the late evening of Saturday, June 24, 1989, Etheredge and Bambi Kerns became

---

1. The judge initially reserved decision on the motion as to the false arrest count, but ultimately allowed the jury to consider it.

embroiled in a domestic altercation. During the course of the argument, Etheredge struck Bambi in the face and bruised her cheek. Claudette Kerns, hearing her daughter screaming, intervened and directed Etheredge to stop. Bambi Kerns went to her mother's room and spent the night there, leaving the couple's nine-month-old son, Vaughn, in his parents' bedroom with his father.

On the following evening, Claudette Kerns told Etheredge that she was not going to allow anyone to argue with or strike her child in her house, and that Etheredge was going to have to move out. Between 11:30 p.m. and midnight, apparently apprehending that Etheredge would try to take Vaughn with him if he did leave,[2] Claudette Kerns dialed 911. She reported to the police that there has been a domestic disturbance at her home between her daughter and her daughter's boyfriend. She explained that she thought she would need help in inducing the boyfriend to leave her house. In response to a question from the dispatcher, Claudette Kerns stated that Etheredge was not dangerous. Bambi Kerns' adult brother, Barrett Kerns, also told Etheredge to leave, and he made an independent call to the police.

While Claudette Kerns and Barrett Kerns were awaiting the police, Bambi Kerns and Etheredge were giving Vaughn a bath on the second floor of the Kerns residence. Bambi told Etheredge that the people in the house were upset with him, and that it would be best for him to go somewhere else until things cooled down. She suggested that Etheredge "come back tomorrow and see what's up." Etheredge agreed and, on his way downstairs, he saw Officers Brian Paige and Denise Calhoun. Seconds later, under circumstances which were disputed by the parties at trial, there was a bullet in his back.

## B. The Plaintiff's Version.

Counsel for the plaintiff presented testimony which, if credited, suggested that Garcia

Etheredge was shot without justification. Etheredge testified that, as he was coming down the stairs, he saw the two police officers with their pistols drawn. The male officer ordered him to "drop the gun or I will shoot." Etheredge immediately turned around, so that he was facing Bambi and Vaughn, who had remained on the second floor landing. Attempting to comply as best he could with a police command to drop a handgun which he did not have, Etheredge reached into his left pants pocket with his left hand[3] and threw a closed switchblade knife over the banister. Etheredge described the ensuing sequence of events as follows:

Q. After you took the knife out of your pocket and threw it in the manner that was shown to the Court and jury, what did you do next? What did you do with your left hand?

A. Then I brought my hand down. Then the Officer told me to stop and then he shot me.

Q. That was the second time that you had been told to stop?

A. No. I had not been told to stop at first. I was told to drop a gun at first.

Q. So, that was the second remark by the Officer?

A. Right.

Q. Then you were shot?

A. Right.

Q. When you were shot, Mr. Etheredge, which direction were you facing?

A. I was facing towards going up the steps.

Q. That would be with your back directly to the officers?

A. Yes, with my back, yes, with my back towards the officer.

Q. Where were you shot, sir?

---

2. Claudette Kerns' apprehension may have been precipitated by Etheredge's conduct earlier in the day. On the afternoon of Sunday, June 25, Etheredge had taken Vaughn to the park. There, Etheredge had consumed wine coolers and smoked crack cocaine. By late evening, he had not brought his son home; Bambi Kerns and her mother finally located father and son at a friend's home.

3. Etheredge testified that he is left-handed. He was, however, wearing his watch on his left wrist.

A. I was shot in the back, almost in the center of my back.

Q. Did you at any time turn your body either to the right or to the left after throwing the knife over the banister?

A. No, I didn't.

Q. Did you at any time turn your body to the right or to the left after you started back up the steps and had gone facing in that direction?

A. No, I didn't.

Etheredge denied as "not correct" a suggestion by counsel for the District that the knife left his hand after he was shot. He testified that while he was lying on the ground, wounded, the male officer frisked him. Etheredge demanded "why the fuck did you shoot me" and spat in the officer's face. Etheredge was placed under arrest for assault on a police officer with a deadly weapon. He was taken to the hospital, where he was handcuffed to his bed. He remained a prisoner until the charges against him were dismissed in August 1989.

Bambi Kerns testified that at the time of the shooting, she was on the landing at the top of the steps, three to six feet from Etheredge. She was holding Vaughn in her arms. She stated that when the police came in, the male officer told Etheredge to stop or halt.[4] Etheredge turned around and started to walk up the steps. She saw Etheredge throw something over the banister with his left hand and place his hand back at his side. Ms. Kerns then heard a shot, which struck Etheredge in the back; she did not witness the shooting itself. Ms. Kerns testified that

Etheredge was not turning at the time he was shot.

### C. The District's Version.

Officer Denise Calhoun had joined the MPD on October 24, 1988, eight months before Garcia Etheredge was shot. She testified that she and her partner, Officer Brian Paige, had received a "Code 1" (without delay) assignment, directing them to respond immediately to the Kerns residence regarding a "man with a gun." Before she and Paige entered the home, Barrett Kerns, who was on the street outside the home, told them that his sister and her boyfriend had had an argument and that the boyfriend had a gun on him.[5] He described the weapon as a small Derringer handgun. Recognizing that they were on a dangerous mission,[6] the two officers entered the front door of the house, which was slightly ajar. Officer Calhoun placed her weapon behind her thigh. As she and Officer Paige approached the stairwell, she observed Etheredge on the steps and Bambi Kerns and the baby at the top level.

As Etheredge began to walk down the stairs, Officer Calhoun ordered him to "freeze." Officer Paige yelled something to the same effect. Etheredge whirled around as if to go upstairs and reached into his pocket with his right hand. Officer Calhoun could not see what was in Etheredge's hand. As Etheredge was pulling his arm up and starting to turn, Officer Calhoun heard a round go off. She realized soon thereafter that Etheredge had been shot in the back.

4. In this respect, Bambi Kerns' testimony differed from Etheredge's; Etheredge insisted, as we have seen, that the police's initial directive was to "drop the gun" and that the order to halt came later.

5. Etheredge insisted that he had never had or owned a handgun. Claudette Kerns and Bambi Kerns testified that they had never seen him with one. No such weapon was ever recovered.

The police officers both testified, on the other hand, that Barrett Kerns had told them, prior to their entry, that Etheredge had a "Derringer." Barrett Kerns did not testify, and the radio run was not introduced into evidence. Etheredge himself testified, however, that the officers immediately told him to "drop the gun."

6. In response to counsel's question whether she believed that she and her partner were in danger, Officer Calhoun testified as follows:

Well, to answer your question, yes, I think that there was a danger to me, because when I was outside, the young man was very upset. He was very angry and upset. He looked like he was scared. He made me believe that Mr. Etheredge really had a weapon, because I repeatedly asked him, over and over again, and I always do that, whenever I know that there is someone mentioning that a subject may have a weapon, because of the seriousness of it. And in my mind, I knew that he had a weapon, so I was concerned about my safety as well as my fellow partner's safety, as well as the young lady and the child in the house, their safety.

Officer Paige testified that when he and Officer Calhoun arrived in the area of the Kerns residence, Barrett Kerns told them not only that he had seen Etheredge inside with a gun, but also that

> this person [inside] with the gun was acting crazy, and that the person had kicked in the door, forced his way in.[7] He told us to be careful because this person might shoot us.

Officer Paige continued that when he and his partner approached the front door of the home, he noticed that the lock had been broken. Cautiously, the officers entered. A man who matched the lookout which the officers had received for a man with a gun—a light-skinned black male with a red shirt and black pants—was beginning to walk down the stairs. According to Officer Paige, both he and his partner, who had their police weapons drawn, immediately yelled at Etheredge—obviously, he was the man—to "freeze." Instead of "freezing," Etheredge whirled around, reached into his pocket, pulled out a silver object, and turned towards Paige, who fired a single shot. Officer Paige explained his reasons for doing so:

> Q. Back down the stairs just before you shot, how fast was that motion of going into the pocket and starting to turn?
>
> A. Seconds, maybe 2 seconds at the most.
>
> Q. Did you have any feeling as to what that object was that you saw come out of his pocket?
>
> A. In my heart, I thought that it was a gun. I thought that he was going to turn around and shoot me or Denise.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Q. If someone were to say that the object in his hand [was] thrown before you shot, would that be correct?
>
> A. No. That would not be correct. There was no motion like that whatsoever.
>
> Q. If someone were to say that the hand reached into the left hand pocket, would that be correct?

> A. No, it would not.
>
> Q. Was there any doubt in your mind at the time that he pulled the object from his pocket, raised his arm and started to turn, that that motion that you have described, that there was fear for your safety or the safety of others?
>
> A. Definitely, there was fear. I was in fear of my life. There was no doubt in my mind that he had a gun and he was getting ready to turn towards me with it.

————

In a nutshell, the plaintiff's version was that Officer Paige told him to drop the gun, that he tried to comply by discarding the knife, that he put his hands back to his side, and that, after he had done so, the officer shot him in the back. The defense version was that Etheredge was told to freeze, that he disobeyed the order, that he whirled around with a weapon that momentarily resembled the handgun about which the officers had been warned, and that Paige shot him because he reasonably believed that Etheredge himself was about to fire.

### D. Expert Testimony.

In addition to the "fact" witnesses, each party presented expert testimony concerning the propriety of the officers' actions. Plaintiff's expert, Eric Johnson,[8] testified that the standard of care applicable to the present case is to be found in District of Columbia Regulation No. 72–2, D.C.Reg. 417 (January 14, 1972), which provides in pertinent part that an officer must

> (a) ... in all cases use only the minimum amount of force which is consistent with the accomplishment of his mission, and shall exhaust every other reasonable means of apprehension or defense before

---

7. Claudette Kerns testified that the door to her home was not damaged. There was no testimony from any witness that Etheredge had kicked in the door.

8. Johnson was an Assistant State's Attorney in Montgomery County, Maryland and a former police officer and training instructor at the Montgomery County Police Academy.

resorting to the use of firearms. (b) No member of the Metropolitan Police force shall discharge a firearm in the performance of police duties except . . .: (1) To defend himself or another from an attack which the officer has reasonable cause to believe could result in death or serious bodily injury.

According to Mr. Johnson, this regulation represents prevailing police practice throughout the country.

Mr. Johnson testified that, in his opinion, Officer Paige violated the standard of care both by his actions prior to entering the Kerns home and by his conduct inside the residence. Johnson was of the opinion that, before making their entry, the officers should have obtained more information about the situation inside the home, including the number and identities of the occupants and the activities of the suspect. Since the report was for a "man with a gun," a prudent officer would have inquired whether the suspect had the weapon in his hand or on his person (as distinguished from simply owning one). With additional information, according to the witness, the officers could have established a line of communication with the suspect, and then asked him to come out. This might well have avoided a situation in which "split second" decisions would have to be made. Johnson concluded that "the way that the police officers responded to that particular call, given the information that was provided, was insufficient, and . . . it was not a proper way to handle that kind of an incident."

Mr. Johnson was also of the opinion that Officer Paige's actions inside the house were unreasonable and not in conformity with the standard of care. He explained that officers were required to exhaust every other means available before resorting to the use of deadly force. Citing, *inter alia*, an example provided in the MPD manual relating to the use of firearms, Johnson stated that once a suspect had thrown away his weapon, the use of deadly force was no longer justified. He stated that Etheredge's actions "were inconsistent with the actions of a person who was going to assault anybody," because "[a]ssaultive conduct comes at you; not going away from you." Moreover, the presence of Bam-

bi Kerns and the baby a few feet from Etheredge made the shooting even more imprudent. Johnson concluded that this was an "improper shooting," that the arrest was "clearly improper," and that "the training in this case was improper."

The District's expert witness, Glen Murphy, had extensive credentials in the field of police practices, procedures, and training, including the use of firearms. Mr. Murphy stated that, in his opinion, it was correct police procedure, under the circumstances, for the officers to enter the Kerns home. He testified that Officer Paige acted properly in shooting Etheredge when it appeared that Etheredge was drawing a weapon. He stated that anyone who was within twenty-two feet of an officer might be able to wound or kill the officer with a knife before the officer could draw his weapon from his holster and shoot, and that, under the nationally recognized standard of care, Officer Paige was therefore entitled to take preemptive action to protect himself and others. Murphy testified that it was reasonable for Officer Paige to believe that his life was in danger after Etheredge had reached into his pocket and extracted a shiny object.

## II.

## THE JUDGMENT NOTWITHSTANDING THE VERDICT

### A. The Legal Standard.

 "In determining whether or not the trial court properly granted judgment for the District notwithstanding the verdict of the jury, the rule to be applied is the same as that used in passing upon a motion for a directed verdict." *Proctor v. District of Columbia,* 273 A.2d 656, 659 (D.C.1971). The evidence must be viewed in the light most favorable to the plaintiff, who is entitled to every legitimate inference therefrom. *Shewmaker v. Capital Transit Co.,* 79 U.S.App. D.C. 102, 103, 143 F.2d 142, 143 (1944); *see also District of Columbia v. Bethel,* 567 A.2d 1331, 1334 & n. 3 (D.C.1990). It is only in the unusual case, in which only one conclusion could reasonably be drawn from the evidence, that the court may properly grant judgment notwithstanding the verdict. *Levy*

*v. Schnabel Found. Co.,* 584 A.2d 1251, 1254–55 (D.C.1991); *Rich v. District of Columbia,* 410 A.2d 528, 532 (D.C.1979). Moreover, it is the responsibility of the jury (and not the judge) to weigh the evidence and to pass upon the credibility of the witnesses. *Rich, supra,* 410 A.2d at 534 (citations omitted). If impartial triers of fact could reasonably find the plaintiff's evidence sufficient, the case may not be taken from the jury. *Finkelstein v. District of Columbia,* 593 A.2d 591, 594 (D.C.1991) (en banc).

In the present instance, the trial judge granted judgment notwithstanding the verdict with respect to all three claims in Etheredge's complaint, namely assault and battery, negligence, and false arrest. We consider each in turn.

### B. Assault and Battery.

■ For present purposes, an assault may be defined as an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim. STANDARDIZED CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.06A (4th ed. 1993); *see, generally, Jackson v. District of Columbia,* 412 A.2d 948, 955 & n. 15 (D.C. 1979) (quoting RESTATEMENT (SECOND) OF TORTS, § 21 (1965)). "A battery is an intentional act that causes a harmful or offensive bodily contact." *Jackson, supra,* 412 A.2d at 955 (quoting RESTATEMENT (SECOND) OF TORTS, *supra,* § 18). It is undisputed that Officer Paige assaulted and battered Etheredge when he shot him; the question is whether, under the circumstances, Paige had the legal right to do so.

■ A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not "in excess of those which the actor

reasonably believes to be necessary." *Jackson, supra,* 412 A.2d at 956 (citation omitted). Moreover, any person, including an officer, "is justified in using reasonable force to repel an actual assault, or if he reasonably believes he is in danger of bodily harm." *Johnson v. Jackson,* 178 A.2d 327, 328 (D.C.1962). Use of "deadly force," however, is lawful only if the user actually and reasonably believes, at the time such force is used, that he or she (or a third person) is in imminent peril of death or serious bodily harm. *McPhaul v. United States,* 452 A.2d 371, 373 (D.C.1982).[9]

■ The Supreme Court has recognized that

> [t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989) (citations omitted).[10] Nevertheless, an officer is subject to criminal liability for using "unnecessary and wanton severity in arresting or imprisoning any person." D.C.Code § 4–176 (1988). "The public policy behind [this] statute is to promote the safety of citizens by deterring police use of excessive force." *District of Columbia v. Peters,* 527 A.2d 1269, 1274 (D.C.1987).

In the present case, the plaintiff's evidence, which must be credited for purposes of a motion for judgment n.o.v., *Rich, supra,* 410 A.2d at 534, established that Etheredge had attempted to comply with a police com-

---

**9.** "Deadly force" is force which is likely to cause death or serious bodily harm." *McPhaul, supra,* 452 A.2d at 373 n. 1 (quoting CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 5.14 (3d ed. 1978).

**10.** Etheredge attempts to distinguish *Graham,* a civil rights action brought pursuant to 42 U.S.C. § 1983, on the ground that the plaintiff's burden in such a suit is more onerous than in a common law action for assault or negligence. *See, e.g., Quezada v. County of Bernalillo,* 944 F.2d 710,

714 (10th Cir.1991). Although we agree with Etheredge's thesis that there are differences between a federal constitutional claim and a tort suit brought under District of Columbia law, we think that the passage from *Graham* quoted in the text reflects a realistic recognition of the perils of police work. The reality of these perils does not turn on the forum in which the plaintiff subsequently seeks redress or on the legal authorities on which he relies.

mand to drop a non-existent gun, that his hands were at his side, that he was proceeding upstairs, away from the two police officers, and that he was shot in the back after he had discarded his weapon. The plaintiff's expert witness testified that, under these circumstances, Etheredge did not present a danger to the officers at the time of the shooting, and that the shooting was therefore unjustified. Although Officer Paige claimed that he believed that he and his partner were in danger, an impartial jury could rationally find that this belief was unreasonable under the circumstances.

 In denying the District's motion for a directed verdict, the trial judge commented that

> it has been a long time since I witnessed anybody committing an assault and running away. Typically people in flight can be said to have taken defensive measures.
>
> Certainly a person can retreat to a place and then begin offensive measures. But, it appears in this case from all of the credible evidence that the plaintiff had no intention of assaulting the police officer.

Although the judge's personal view of the credibility of the witnesses is not dispositive,[11] we conclude, in part for the reasons stated at trial by the judge, that the plaintiff's evidence on the assault and battery claim was sufficient to require its submission to the jury and to preclude entry of judgment n.o.v. *See District of Columbia v. White*, 442 A.2d 159, 161–63 (D.C.1982); *District of Columbia v. Downs*, 357 A.2d 857, 858–60 (D.C.1976).

### C. Negligence.

 "The plaintiff in a negligence action bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C.1988) (citations and internal quotation marks omitted). The applicable standard of care in cases of this kind is "beyond the ken" of the average lay juror, and expert testimony is therefore required. *Id.; see also White, supra*, 442 A.2d at 164.

In his complaint, Etheredge alleged both that the District itself was negligent in connection with the hiring, training, and supervision of Officer Paige, *see White, supra*, 442 A.2d at 165, and that the District was vicariously liable for Paige's conduct, *id.* at 162 n. 7. Etheredge alleged, among other things, that Paige, while acting within the scope of his employment,

> failed to properly follow normal and accepted police practices and procedures, used excessive force in effectuating the arrest of [Etheredge] in that he shot him [and] did not respond properly to the situation as it existed ...

 Etheredge introduced no evidence as to the circumstances under which Officer Paige was hired, or as to the nature and the sufficiency of the training and supervision provided to Paige. The plaintiff's expert witness testified in conclusory terms that, in his opinion, "the training in this case was improper," but the record contains no factual elaboration of the respect in which this was true. The jury was never made aware, by

---

11. In his written opinion granting judgment n.o.v., the judge noted the testimony of Etheredge and Bambi Kerns regarding the sequence of events, but continued as follows:

> [T]he court finds that, whatever credit the jury gave to that evidence, it is completely unreasonable for jurors, on the whole evidence, to conclude that Officer Paige was in a position to know that Etheredge was disarming himself and ceasing to pose a threat....

120 Daily Wash.L.Rptr. at 2231. If the judge based this view on his personal assessment of credibility, he was without authority to do so on a motion for judgment n.o.v. *Rich, supra*, 410 A.2d at 534.

We emphasize that the judge was not considering a motion for a new trial; on such a motion, the trial judge need not view the evidence in the light most favorable to the non-moving party. Indeed, the judge can, in effect, be the "thirteenth juror;" he may "weigh evidence, disbelieve witnesses, and grant a new trial even when there is substantial evidence to sustain the verdict." *Slatton v. Martin K. Eby Constr. Co., Inc.*, 506 F.2d 505, 508 n. 4 (8th Cir.1974) (citations omitted), *cert. denied*, 421 U.S. 931, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975). The judge's assessment of the witnesses' credibility would therefore have justified granting a new trial, but not a judgment n.o.v.

expert testimony, of "recognized standards concerning such training." *See District of Columbia v. Peters,* 527 A.2d 1269, 1273 (D.C.1987); *White, supra,* 442 A.2d at 164–65 (requiring expert testimony concerning adequacy of the MPD's weapons safety training). We conclude that no reasonable juror could have found negligence on the part of the District in the hiring, training or supervision of Officer Paige.

Turning to the claim of vicarious liability, Etheredge presented, and the judge admitted without relevant objection, evidence of alleged departures from the applicable standard of care on the part of the police, both before their entry into the Kerns home and thereafter. In his written opinion awarding the District judgment n.o.v., however, the judge concluded, contrary to Mr. Johnson's testimony on behalf of Etheredge, that "[t]he relevant time period ... in judging whether Officer Paige's use of deadly force was a breach of the standard of care, is the time that Officer Paige encountered Etheredge at the staircase, rather than the time when the decision was made to enter the house." 120 Daily Wash.L.Rptr. at 2230. He thus retrospectively dismissed as irrelevant any evidence of pre-entry negligence. Moreover, the District claims (apparently for the first time on appeal) that Johnson's testimony that the officers' pre-entry conduct was improper was insufficient because the expert "pointed to no standard—national, regional, or local"—requiring police officers to make additional inquiries or to communicate with the suspect inside the home. *See Toy, supra,* 549 A.2d at 7 ("[w]here expert testimony is necessary, ... it is not sufficient if it consists merely of the expert's opinion as to what he or she would do under similar circumstances").

■ We need not reach these "pre-entry" issues, however, because the evidence of post-entry negligence was sufficient to preclude the judge from entering judgment n.o.v. The claims of negligence and of assault and battery, while not identical in the present context, are nevertheless related. The question with respect to the assault and battery claim is whether Officer Paige initially shot Etheredge without legal justification.

*See White, supra,* 442 A.2d at 163. The negligence claim hinges on whether Paige, (when he shot Etheredge), failed to act as a reasonably prudent officer would have acted. *Id.* Having held that the evidence was sufficient to support the assault and battery claim, we reach the same conclusion as to negligence. The descriptions of the events provided by Etheredge and Bambi Kerns, together with Johnson's expert testimony, would permit an impartial juror to find that Officer Paige used excessive force and failed to act with reasonable prudence when he shot Etheredge. It was therefore the prerogative of the jury, not of the judge, to determine whether Etheredge had proved negligence.

### D. False Arrest.

■ Although he denied the District's motion for a directed verdict with respect to Etheredge's claim of false arrest, the judge granted judgment notwithstanding the verdict, commenting in his written opinion that "[i]t is abundantly clear that JNOV is proper on this claim." 120 Daily Wash.L.Rptr. at 2231. We conclude that the judge correctly declined at trial to take the issue from the jury, but erred when he granted judgment n.o.v.

In *District of Columbia v. Murphy,* 631 A.2d 34 (D.C.1993), this court recently summarized the applicable principles as follows:

> In actions for false arrest and false imprisonment, the central issue is whether the arresting officer was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting officer is privileged and the action fails.... The police officer, however, need not demonstrate probable cause in the constitutional sense. Rather, it will suffice if the officer can demonstrate that (1) he or she believed, in good faith, that his [or her] conduct was lawful, and (2) this belief was reasonable.... In evaluating an officer's claim that he or she acted in good faith in making an arrest, the trier of fact must consider the evidence from the perspective of the arresting officer, not of the plaintiff.

*Id.* at 36–37 (citations and internal quotation marks omitted).

This case is unusual in that Etheredge was charged with one offense, but the District now seeks to sustain the arrest on the ground that probable cause existed to arrest him for two other crimes with which Etheredge was never charged. Etheredge was initially placed under arrest for assault on a police officer with a dangerous weapon (APODW).[12] The APODW charge could rest only on the theory that Etheredge either had a handgun and threatened to shoot the officers—a possibility that had been ruled out by the time the lieutenant who charged Etheredge had arrived—or that Etheredge attempted to injure them with a knife. Etheredge's version was inconsistent with either theory, and an impartial jury which credited his testimony could therefore rationally find that Etheredge did not assault the officers at all. The District does not argue to the contrary.

The District now seeks to sustain the arrest, however, on the grounds that Etheredge illegally possessed a switchblade knife, in violation of D.C.Code § 22–3214(a) (1989), and that he assaulted Officer Paige by spitting at him. *See Ray v. United States,* 575 A.2d 1196 (D.C.1990).[13] The question whether the officers' actions may be sustained, after the fact, because probable cause existed to arrest Etheredge for uncharged offenses is one of first impression in this court.

Historically, "[a]n arrest for one offense cannot be justified by proof of another, even though intimately connected in time and place." *Moran v. City of Beckley,* 67 F.2d 161, 163 (4th Cir.1933) (citations omitted); *see also* 35 C.J.S. *False Imprisonment,* § 35 at 681–82 (1960 & Supp.1993); 32 AM.JUR.2D *False Imprisonment,* § 101 (1982); RESTATEMENT (SECOND) OF TORTS, § 128, comment (b) (1965). In *Moran,* the plaintiffs were arrested for improperly driving in West Virginia in a car with Virginia dealer tags. The defendant Chief of Police subsequently sought to justify the plaintiffs' detention upon the ground that the plaintiffs were speeding. The trial judge instructed the jury that if

they believed that the plaintiffs had been unlawfully arrested for having the wrong tags, the plaintiffs were entitled to recover even if the jury believed that they were speeding. The appellate court sustained the instruction and affirmed the judgment for the plaintiffs which had been entered on the jury verdict. 67 F.2d at 164.

Similarly, the Supreme Court of Oregon has held that

[a] person unlawfully arresting another for one offense cannot, when sued for false imprisonment, justify on the ground that the one arrested was guilty of some other offense, for which the arrest under the circumstances would have been legal or because reasonable grounds existed for an arrest for such other offense.

*McNeff v. Heider,* 337 P.2d 819, 823 (Or. 1959) (quoting Annotation: *Justification in action for false imprisonment by proof of existence of ground other than that on which arrest was made, or one of several grounds on which it was made,* 64 A.L.R. 653 (1929)); *see also Dupas v. City of New Orleans,* 485 So.2d 594, 595 (La.App.1986); *Hallenbeck v. City of Albany,* 99 A.D.2d 639, 640, 472 N.Y.S.2d 187, 188–89 (3d Dept.1984) (per curiam); *Roberts v. City of Stillwater,* 646 P.2d 6, 7–9 (Okla.App.1982). Although there is no District of Columbia authority directly in point, it has been held in this jurisdiction that "[a] lack of probable cause cannot be made up in hindsight by a hypothetical variation in the basis on which a search was conducted." *United States v. Cunningham,* 133 U.S.App. D.C. 29, 30, 424 F.2d 942, 943 *cert. denied,* 399 U.S. 914, 90 S.Ct. 2218, 26 L.Ed.2d 572 (1970); *see also United States v. Branch,* 178 U.S.App.D.C. 99, 108 n. 24, 545 F.2d 177, 186 n. 24 (1976).

■■■ We have no quarrel with these authorities in principle. There are circumstances, however, under which their mechanical application could lead to unjust and unreasonable results. Borrowing a phrase from the world of sports, we advert to the

---

12. Officer Paige testified that the victims of the charged assault were Officers Calhoun and Paige. He stated that the decision to charge Etheredge with APODW was made by a lieutenant who arrived on the scene after the shooting.

13. Neither of these facts is in dispute; Etheredge admitted possessing the switchblade and spitting at Officer Paige.

rule of "no harm, no foul." Where a technical charging error by the police in characterizing the plaintiff's conduct did not affect what subsequently happened to the plaintiff, there is no reasonable basis for imposing liability. If, for example, police arrest a man who has entered a home and raped the occupant, and charge the man with burglary (but not with rape), the rapist ought not to be permitted to recover damages if it subsequently appears that probable cause as to burglary was lacking, when probable cause existed to charge the plaintiff with rape, and he could and would have been arrested for that offense anyway.

In *Trejo v. Perez*, 693 F.2d 482 (5th Cir. 1982), the court recognized that basing an arrest on the incorrect ground need not necessarily result in the imposition of civil liability. Perez, a police officer, arrested Trejo for disorderly conduct. He had no probable cause to believe that Trejo had committed this offense. In a subsequent suit by Trejo for false arrest, however, the defense claimed that Perez would have had the authority to arrest Trejo pursuant to the Texas "Stop and Identify" statute. The court held that although Perez admittedly did not have the "Stop and Identify" provision in mind when he arrested Trejo, the jury should nevertheless have been permitted to consider whether the arrest was justified under that law. The court explained that

> here disorderly conduct and failure to identify were sufficiently related that an objective police officer might have charged the offense of failure to identify. The conduct that gave rise to the arrest for disorderly conduct was Trejo's use of vulgar language in a public place. The conduct that might have permitted an arrest for violating § 38.02 was Trejo's use of vulgar language in response to a request for identification.

*Id.* (footnote omitted). *Trejo* thus stands for the proposition that, in general, if the plaintiff could lawfully be arrested for the conduct in which he engaged, the arresting officer's error as to the precise statute which the plaintiff probably violated does not give rise to liability for false arrest.

The reasoning of *Trejo* can have no application, however, if the defense presents an after-the-fact justification for the arrest, postulating a new and different charge, but if an arrest on the postulated charge (for which probable cause existed) would have had consequences for the plaintiff less serious than those resulting from an arrest on the charge on which he was actually arrested, but for which probable cause was lacking. *Snead v. Bonnoil*, 166 N.Y. 325, 59 N.E. 899 (1901) is illustrative. In that case, peace officers arrested Snead without probable cause on suspicion of larceny, a felony. Following the arrest, the officers found a loaded revolver on his person. Snead was charged with a misdemeanor weapons offense, of which he was subsequently convicted. Snead sued one of the officers for false imprisonment. The officer defended upon the ground that Snead's guilt of the weapons offense established that there was probable cause for his arrest, and that the existence of probable cause defeated Snead's civil action. The court, however, sustained a verdict in Snead's favor, holding, *inter alia*, that he had been prejudiced by his arrest for a felony rather than for a misdemeanor:

> It is not a matter of technicalities, but of substance. If a person is arrested for a misdemeanor, his admission to bail before conviction is a matter of right; while, where the arrest is for felony, it is a matter of discretion. Code Crim.Pro. § 553. The plaintiff was not only detained in prison upon an unfounded charge; but he was deprived of the right of claiming his immediate admission to bail.

166 N.Y. at 328–29, 59 N.E. at 900. The court concluded that it therefore "would not do to hold that the illegality of a person's arrest upon an unfounded charge could be cured by the subsequent charge and conviction of another offense." *Id.* at 329, 59 N.E. at 900.

■ Considering *Trejo* and *Snead* together, we conclude that where probable cause was lacking to arrest a plaintiff on the announced charge, but where probable cause existed to believe that he committed a different offense proffered by the defense after the fact, the defense can avoid liability if the

consequences for the plaintiff probably would have been substantially as unfavorable if he had been arrested on the charge on which the defense seeks to rely after the fact.

We now apply these principles to the case at hand. Etheredge testified that he was charged with APODW and that his bond was set, apparently in his absence, at $50,000. He stated that while he was at D.C. General Hospital, he was consistently handcuffed to the bed. When he asked for a "pain pill," one of the administrators told him that "you ain't at the Washington Hospital Center now." After spending approximately one month at the hospital, Etheredge was transferred to the infirmary at the District of Columbia Jail. About two weeks later, he was brought to court, where his counsel requested a reduction in the bond. The prosecution, however, did not have its file ready, and the case was continued. A short time thereafter, the United States Attorney's office dropped the charge against Etheredge, and he was released.

At trial, no party addressed the question whether Etheredge's circumstances would have been more favorable if he had been charged with unlawful possession of the switchblade (or with spitting at an officer who had just shot him in the back) rather than with an armed assault on two police officers. It is surely at least plausible, however, that conditions more lenient than a bond in the amount of $50,000 would have been set if the severely wounded defendant had been charged with a regulatory (but non-assaultive) weapons offense, or with his unlawful (but here arguably understandable) spitting, or both. A lower bond, or release on Etheredge's personal promise to appear, could have avoided or shortened his detention.

14. On remand, the trial judge may be confronted with the question whether Etheredge must prove that he would have received more favorable conditions of release, and would have been treated less severely, if he had been charged with possession of a switchblade knife and with spitting at an officer (rather than with APODW), or whether, on the contrary, the District's justification of the arrest based on the existence ·of probable cause to believe that Etheredge committed the uncharged offenses is in the nature of an affirmative defense, in relation to which the District has

In the proceedings in the trial court, neither Etheredge's attorney nor the Assistant Corporation Counsel correctly identified the legal principles applicable to Etheredge's false arrest claim. Etheredge made no attempt to prove that he would have received more favorable conditions of release, and thus would have avoided prolonged detention, if he had been charged with the offenses as to which police had probable cause, rather than with APODW. The District made no attempt to prove the contrary. The present case, however, is the first in this jurisdiction in which these principles have been expounded, and counsel should not be faulted too heavily for failing to anticipate our analysis. Since there must be a new trial in any event, and since the imposition of a high bond and Etheredge's subsequent prolonged detention might not have come about if APODW had not been charged, the parties must be given a second opportunity to cross swords on this issue.[14] Accordingly, we vacate the judgment n.o.v. on the false arrest count.

## III.

### THE JUDGE'S EX PARTE CONTACT WITH THE JURORS

*A. The Sequence of Events.*

■ On Wednesday, April 29, 1992, the third day of the trial in this case, a state court jury in Simi Valley, California, acquitted three Los Angeles police officers of all charges in the beating of Rodney King; a fourth officer was found not guilty of two charges, but the jury failed to reach a unanimous verdict as to the third count against him. Widespread civil disorders erupted in response to the verdict. On Thursday, April 30, 1992, *The Washington Post's* banner headline proclaimed:

the burden of proof. This issue is not an easy one, and it has not been addressed at all by the parties. We are reluctant to dispose of more than we have to without the refinement provided by "a clash of adversary argument exploring every aspect of a multi-faceted situation...." *See United States v. Fruehauf,* 365 U.S. 146, 157, 81 S.Ct. 547, 554, 5 L.Ed.2d 476 (1961). Accordingly, we leave it to the trial judge, if the case reaches that point, to entertain argument from counsel and to rule on this issue in the first instance.

NATIONAL GUARD CALLED TO STEM L.A. VIOLENCE AFTER OFFICERS' ACQUITTAL ON ALL BUT ONE COUNT.

It was on the day that this headline appeared that Etheredge's case went to the jury.

On the evening of April 30, counsel for the District telephoned the judge's law clerk and opposing counsel and informed them that he proposed to move for a mistrial on the following day. On Friday, May 1,[15] counsel made this motion in open court. He expressed concern that the jury would be consciously or unconsciously affected by the Simi Valley verdict and its aftermath, and might "feel that for some reason or another it would be required to return a verdict against the defendant ... to send a message, if you will, or to serve some greater purpose." The judge denied the motion, observing that counsel for the District could have requested, but did not request, a *voir dire* examination of the jurors to determine whether the verdict, rioting, and resulting publicity would interfere with the ability of any of them to return an impartial verdict. The judge added that he was "persuaded that the jurors are going about their duty in examining this case on its merits and that the verdict they return will reflect their determination of [the] evidence in the case and the law as the court instructed them." The jury continued its deliberations without incident for the remainder of the day.

The judge's *ex parte* contact with the foreman occurred on Monday, May 4, 1992. As described in the judge's written opinion, 120 Daily Wash.L.Rptr. at 2230,

[o]n Monday, May 4, 1992, the court spoke to the foreman of the jury, in the jury room, prior to the arrival of all jurors. The foreman was told that, in light of the fact that the Mayor of the city had gone on record as approving liberal leave for District Government workers to participate in a peaceful protest demonstration to be held in the city that day, the court would like him to solicit the views of each juror to determine whether they wished to partici-

pate in the demonstration, and to report his findings to the court. Within thirty minutes the court received a [note] from the foreman stating that the jury wished to be excused for the day.

Shortly after this unrecorded conversation between the judge and the foreman, the jury sent the judge a note stating that "we will [sic] like to leave for today." The judge excused the jury until the following morning. Explaining that the Mayor had "encouraged government employees ... who wanted to protest the verdict in the Rodney King case, to take off today, and encouraged supervisors of these employees to grant liberal leave," the judge stated that "as a judge on the Superior Court, [I] can do no less than approve your request, particularly since you are together on this." He concluded by telling the jurors "Don't go home. Protest. And go home after you protest."

After the jury was excused, the District renewed its motion for a mistrial. The renewed motion was based on the extensive press coverage of the disturbances. Counsel for the District did not, however, mention in his argument the judge's encouragement of the jurors, in open court, to participate in a protest against the Simi Valley verdict. The jurors resumed their deliberations on the morning of Tuesday, May 5, 1992. Two hours later, they returned a verdict totalling more than one and a half million dollars in Etheredge's favor.

### B. Legal Analysis.

There are, perhaps, some non-substantive matters which are so removed from the merits of a case that *ex parte* communication between judge and jury may be intrinsically harmless. *See, e.g., Guzzi v. Jersey Central Power & Light Co.*, 36 N.J.Super. 255, 115 A.2d 629, 634 (1955) ("[e]xcluded from any impropriety is the message of the hungry jury, transported by the attending officer to the judge, that they desired some abdominal timber ...").[16] The subject which the trial

---

15. On that day, the *Post's* headline told of 24 DEAD, 900 INJURED IN L.A. RIOTING.

16. But *cf. Yarsunas v. Boros*, 423 Pa. 364, 223 A.2d 696, 697 (1966) (citations omitted), holding

that "[t]he practice of trial judges in communicating with the jury or instructing the jury in any manner whatsoever, other than in open court and in the presence of counsel for all the parties,

judge chose to raise with several jurors in the jury room,[17] however, was not of that character. The Simi Valley verdict carried an obvious emotional wallop. The acquittals and the riots that followed generated intense feelings in many people. The events in California had prompted the District to move for a mistrial after several days of trial. It was therefore important for all concerned, and especially for the judge, to deal with so inflammatory a subject with restraint, lest it derail the ongoing trial.

The judge apparently believed, in light of the Mayor's decision to encourage District employees to participate in the protests against the California jury's verdict, that he had an obligation to provide a similar opportunity to the *Etheredge* jurors. Even if we assume, without deciding, that the situations of the employees and the jurors were comparable, and that the judicial branch should have considered following the lead of the executive branch and encouraging even jurors to protest, a legitimate alternative manner of proceeding was available to the judge. Specifically, he could have raised the issue with counsel in advance, outside the presence of the jury. Armed with the views of the parties as to how to proceed, he could then have taken whatever action he deemed appropriate, preferably with the consent of all concerned. If no such consent was forthcoming, any objecting party would have had the opportunity to state its views. Any communication with the jury could then have been effected in open court, in the presence of counsel and the parties. Unfortunately, however, the judge spoke to the foreman and others *ex parte*, without prior notice to the attorneys, and without any record being made of the discussion in the jury room. This was reversible error.

■■■ In light of his high office and potential influence upon the jurors, the judge was required to exercise an especially high degree of circumspection in his communications with the jury. *Daniels v. Bloomquist*, 258

Iowa 301, 138 N.W.2d 868, 872 (Iowa 1965). The Supreme Court has recognized that "[a]ny *ex parte* meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error." *United States v. United States Gypsum Co.*, 438 U.S. 422, 460, 98 S.Ct. 2864, 2885, 57 L.Ed.2d 854 (1978). The Court went on to explain that

> [u]nexpected questions or comments can generate unintended and misleading impressions of the judge's subjective personal views which have no place in his instruction to the jury—all the more so when counsel are not present to challenge the statements. Second, any occasion which leads to communication with the whole jury panel through one juror inevitably risks innocent misstatements of the law and misinterpretations despite the undisputed good faith of the participants.

*Id.* at 460–61, 98 S.Ct. at 2885–86; *accord, Lukstas v. Saint Francis Hosp. & Medical Center,* 23 Conn.App. 680, 583 A.2d 941, 943–44 (1990).

■■■ It is "indefensible" for the judge to enter the jury room while jurors are there. *Zaitzeff v. Raschke,* 387 Mich. 577, 198 N.W.2d 309, 310 (1972), *overruled in part on other grounds, State v. France,* 436 Mich. 138, 461 N.W.2d 621, 622–23 (1990). This is so because "[t]he right of the parties to be present in person and by counsel at all stages of the trial, except the deliberations of the jury, is basic to due process." *Leonard's of Plainfield, Inc. v. Dybas,* 130 N.J.L. 135, 31 A.2d 496, 497 (1943). Accordingly,

> privy communications in the absence of counsel, particularly when oral, between a trial judge in chambers and a jury engaged in deliberations in the jury room concerning *any matter implicated ever so remotely in the consideration and decision of the case* are forbidden by the essentials of our trial procedure as imperiling, perhaps, the principles of due process.

---

must be terminated" and requires a new trial even in the absence of proof of prejudice.

**17.** In support of its post-trial motion, the District filed affidavits from several jurors in which it

was revealed that the foreman was not the only juror present when the judge was in the jury room.

*Guzzi, supra,* 115 A.2d at 634 (emphasis added).

■■■ These proscriptions against improper contacts apply equally to criminal and civil cases. *Petrycki v. Youngstown & N.R.R. Co.,* 531 F.2d 1363, 1366 (6th Cir.) *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 138 (1976). Although an improper *ex parte* communication between judge and jury is subject to "harmless error" analysis, *id.* at 1367, it raises at least a strong inference of reversible error. *Id.; accord, Standard Alliance Indus., Inc. v. Black Clawson Co.,* 587 F.2d 813, 828 (6th Cir.) *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979). The court stated in *Petrycki, supra,* that "[b]ecause we cannot say *with certainty* that no harm was done in this case by the [ex parte contact] between the court and the jury, with counsel absent, we must reverse and remand for a new trial." 531 F.2d at 1368 (emphasis added). The underscored phrase may be an overstatement, for absolute certainty is rare. We conclude, however, that where a potentially prejudicial *ex parte* communication has occurred, the party seeking affirmance must demonstrate that the error was harmless. *Cf. Johnson v. United States,* 544 A.2d 270, 273 (D.C.1988); *State v. Estrada,* 69 Haw. 204, 738 P.2d 812, 828 (1987).

No such showing has been or can be made here. Even if the *ex parte* proceedings in the jury room had been transcribed, which they were not, "there was no chance for [the District] to object to what Judge [Rankin] said, [nor can it be determined] whether any special verbal emphasis or facial expressions were given to certain terms which could have improperly influenced the jurors." *Estrada, supra,* 738 P.2d at 827–28. In the present case, in which the subject under discussion was unusually volatile, the possibility was enhanced that an unintended "message" affecting the merits was communicated by the judge to the jury. Not knowing exactly what was said in the jury room, or how it was said, or how the foreman communicated the judge's inquiry to the other jurors, we cannot be confident that the judge's *ex parte* communication did not influence the jury's decision either as to liability or as to the amount of damages.

This case is quite unlike *Lewis v. United States,* 567 A.2d 1326 (D.C.1989), in which we affirmed a conviction in spite of an *ex parte* contact between the judge and a juror. Both parties in *Lewis* consented to the contact, and its substance was repeated in open court. *Id.* at 1328–29. *See also Johnson, supra,* 544 A.2d at 273 (decision of court to excuse juror whose mother had died was harmless error, in spite of the court's failure to notify counsel in advance; the lack of any prejudice was obvious, for the juror did not participate in the decision regarding the defendant's guilt or innocence). The subjects addressed by the judge in *Lewis* and *Johnson* were essentially innocuous; the Simi Valley verdict and its aftermath were not.[18]

■■ Etheredge notes in his reply brief that the District failed to object when the judge, in open court, authorized the jurors to participate in the protest of the California verdict. He contends that the District is therefore precluded from contending on appeal that the judge erred in doing so. *See D.D. v. M.T.,* 550 A.2d 37, 48 (D.C.1988). So far as appears from the record, however, counsel for the District had no means of knowing that the jury note requesting a day off from deliberations was solicited by the judge for the purpose of allowing the jurors

18. The decisions relied on by Etheredge do not advance his cause. In *Life From the Sea, Inc. v. Levy,* 502 So.2d 473, 475 (Fla.App.1987) (per curiam), the court held that a party seeking reversal on the basis of an *ex parte* communication between judge and jury must prove prejudice, but recognized that such proof could be satisfied by a "showing of an inability of the reviewing court to determine whether the action was actually harmless." In *Loatman v. Patillo,* 401 A.2d 91, 92 (Del.1979) (per curiam), the court reversed a judgment because the content of an *ex parte* communication was not in the record, and the court was therefore "unable to say that the improper communication was harmless." These decisions support reversal here, for the lack of a record of the events in the jury room precludes any assurance on the part of this court that no harm was done. In *Beck v. Wessel,* 237 N.W.2d 905, 908–09 (S.D.1976) and *Nelson v. Hydraulic Press Mfg. Co.,* 84 Ill.App.3d 41, 39 Ill.Dec. 422, 404 N.E.2d 1013, 1019–20 (1980), it was evident from the record that the judge's *ex parte* communications were harmless.

to demonstrate.[19] The lack of an objection to what appeared to be a proposal *by the jury* does not suggest that counsel would have remained silent if he had known that the idea that the jury participate in the protest originated *with the judge.* After the contact in the jury room was revealed in *The Washington Post,* the District cited the *ex parte* communication as one of its grounds for conditionally seeking a new trial.

## IV.

### CONCLUSION

For the foregoing reasons, the judgment is reversed and the case is remanded to the trial court for a new trial.

*So ordered.*

---

**19.** In his written decision, the judge, after describing his conversation with the foreman in the jury room and the jury note which resulted, stated somewhat cryptically that "[t]he court informed counsel of its actions and, with counsel present, excused the jury until 10:00 a.m. the following day." 120 Daily Wash.L.Rptr. at 2230. We have carefully examined the transcript of the relevant proceedings, and have found nothing to indicate that the judge notified counsel of his *ex parte* communication even after the fact. The record thus supports the claim of counsel for the District (not contradicted by counsel for Etheredge) that the attorneys were not aware of the judge's *ex parte* discussion with the foreman in the jury room until after the verdict was returned.